**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


BILLY LEE BOLES, JR.,               )
                                    )
                  Plaintiff,        )
                                    )
            v.                      )      1:13CV489
                                    )
UNITED STATES,                      )
                                    )
                  Defendant.        )


<u>**MEMORANDUM OPINION AND ORDER**</u>

This case comes before the Court on Defendant's Motion to Strike Expert Reports and Exclude Testimony.  (Docket Entry 24.) For the reasons that follow, the Court will grant Plaintiff's instant Motion.

<u>**BACKGROUND**</u>

This case arises from the alleged negligent acts of employees of the United States Coast Guard in returning firearms to an individual who subsequently used them to injure Plaintiff.  (See Docket Entry 19.)[1]  Relevant to the instant Motion, on May 19, 2014, with minor modifications, the Court adopted the Parties' proposed scheduling order dictating the terms and time line for discovery in this case.  (See Docket Entry 22; Text Order dated May 19, 2014.)  That scheduling order required, inter alia, Plaintiff to submit his expert reports by September 1, 2014, Defendant to

---

[1] The Court (per United States District Judge Thomas D. Schroeder) previously gave a detailed account of the underlying factual background to this case.  (See Docket Entry 18 at 2-6.)

submit its expert reports by November 15, 2014, and Plaintiff to submit any rebuttal reports by December 30, 2014. (Docket Entry 22 at 2.) The Court also set this matter for a bench trial scheduled to begin on October 5, 2015. (Docket Entry 23.)

Plaintiff did not file any affirmative expert reports by the September 1, 2014 deadline. (Docket Entry 25 at 3; Docket Entry 27 at 6.) Despite Plaintiff's decision not to serve any expert reports, Defendant produced reports from its three expert witnesses: economist Dr. Judith Roberts (Docket Entry 25-3), vocationalist Julie Sawyer-Little (Docket Entry 25-4), and orthopaedic surgeon Dr. Vincent E. Paul (Docket Entry 25-5).[2] On December 30, 2014 (Docket Entry 25-6 at 9), Plaintiff produced four "rebuttal" expert reports from: psychiatrist Dr. Richard Weisler (Docket Entry 25-7), vocationalist Maria Vargas (Docket Entry 25-8), economist Dr. Gary Albrecht (Docket Entry 25-9), and

---

[2] Plaintiff has claimed that Defendant did not timely serve its expert reports on November 15, 2014, but, instead, belatedly served them on November 18, 2014. (Docket Entry 27 at 4 n.2.) The purpose for which Plaintiff brought that matter to the Court's attention remains unclear. In addition, the Court notes that Defendant's Certificate of Service verifies that Defendant served its expert reports on November 17, 2014, and not on November 18, 2014. (Docket Entry 25-2 at 9.) Furthermore, the original deadline of November 15, 2014, fell on a Saturday. As with other courts, "[i]t is the longstanding policy of this Court to set dates certain that do not fall on weekends or legal holidays." JLM Advanced Technical Servs., Inc. v. International Paper Co., No. CV410-218, 2011 WL 1303646, at *1 (S.D. Ga. Apr. 4, 2011) (unpublished). Thus, the Court should have modified the Parties' proposed scheduling order to ensure that the various dates fell on non-holiday weekdays. Under these circumstances, the Court declines to address this matter any further at this point.

orthopaedic surgeon Dr. Timothy Sloand (Docket Entry 25-10). Defendant contends that Plaintiff has mislabeled these reports as rebuttal, and the Court should therefore strike them as untimely affirmative expert reports. (Docket Entry 25 at 4.) Plaintiff disagrees and urges the Court to find them as timely filed rebuttal reports. (Docket Entry 27 at 5.)

**ANALYSIS**

The Court must first determine whether Plaintiff's experts' reports qualify as affirmative or rebuttal. If Plaintiff's experts' reports qualify as rebuttal, then the analysis ends because Plaintiff submitted the experts' reports timely. However, if the experts' reports qualify as affirmative, then the Court must determine whether good cause exists for Plaintiff's violation of the scheduling order, and, if not, then identify the appropriate sanction to impose for the untimely disclosure.

1. Affirmative vs. Rebuttal

Generally, testifying expert witnesses qualify as either initial/affirmative experts or rebuttal experts.[3] The Federal Rules of Civil Procedure define a rebuttal expert as one "intended _solely_ to contradict or rebut evidence on the same subject matter identified by another party . . . ." Fed. R. Civ. P. 26(a)(2)(C)(ii) (emphasis added). By contrast, an affirmative

---

[3] Of course, an expert may serve as an affirmative expert witness and also act as a rebuttal expert witness.

expert serves to establish a party's case-in-chief.  See Lead GHR Enters., Inc. v. American States Ins. Co., No. CIV. 12-5056-JLV, 2014 WL 1246499, at *3 (D.S.D. Mar. 25, 2014) (unpublished) (quoting Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006)).  The United States Court of Appeals for the Fourth Circuit has not addressed how a court should determine whether an expert witness qualifies as an affirmative or rebuttal witness. However, the Fourth Circuit has generally defined rebuttal evidence as "evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party."  United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001) (internal quotation marks and alteration omitted).

The Fourth Circuit has also provided that, "[o]rdinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief.  Such new facts might include 'surprise' evidence presented by the defendants. Permissible rebuttal evidence also includes evidence unavailable earlier through no fault of the plaintiff."  Allen v. Prince George's Cnty., Md., 737 F.2d 1299, 1305 (4th Cir. 1984) (internal citation omitted).

In addition, persuasive authority counsels that, "[i]f the purpose of expert testimony is 'to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.'"

4

Amos v. Makita U.S.A., Inc., No. 2:09-cv-013040-GMN-RJJ, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011) (unpublished) (quoting In re Apex Oil Co., 958 F.2d 243, 245 (8th Cir. 1992)). "[R]ebuttal experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." International Bus. Machs. Corp. v. Fasco Indus., Inc., No. C-93-20326 RPA, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995) (unpublished) (internal quotation marks omitted). "[E]xpert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports." Withrow v. Spears, 967 F. Supp. 2d 982, 1002 (D. Del. 2013).

With these principles in mind, the Court will address each expert report, with consideration first given to the relationship between the reports of Ms. Vargas, Dr. Albrecht, and Dr. Sloand and the reports from Defendant to which they nominally respond and separate analysis of Dr. Weisler's report in light of the absence of any apparent counterpart report from Defendant.

### a. Ms. Vargas, Dr. Albrecht, and Dr. Sloand

The Court will compare these three experts' reports with Defendant's reports to determine whether Plaintiff's experts' reports qualify as rebuttal.

### i. The Vocational Experts

On behalf of Defendant, Ms. Sawyer-Little opined as to Plaintiff's "present functional status/abilities and vocational capacity." (Docket Entry 25-4 at 2.) In her analysis, Ms. Sawyer-Little noted Plaintiff's physical limitations, including problems with his right arm and his hip. (<u>Id.</u> at 5.) However, Ms. Sawyer-Little could not provide an opinion regarding his present vocational status without additional information. (<u>Id.</u> at 5-6.)

In contrast, Ms. Vargas performed a vocational analysis of Plaintiff and focused not only on his physical ailments but included Dr. Weisler's findings regarding Plaintiff's mental health issues as well. (Docket Entry 25-8 at 2-5.) Ms. Vargas concluded that: "Based on the Mental Capacity Assessment completed by Dr. Weisler, I would consider [Plaintiff] to be severely vocationally disabled." (<u>Id.</u> at 7.) Ms. Vargas also added that Plaintiff's injuries to his right hand would also preclude employment. (<u>Id.</u> at 8.) Ms. Vargas's opinion relies heavily on Dr. Weisler's findings, and throughout her report she focuses on Plaintiff's mental health issues. (<u>See</u> <u>id.</u> at 5-7.)

### ii. The Economists

On behalf of Defendant, Dr. Roberts opined as to the economic damages Plaintiff suffered as a result of the incident. (<u>See</u> Docket Entry 25-3.) Dr. Roberts calculated Plaintiff's total economic loss as $19,779.97. (<u>Id.</u> at 4.) This figure included

$11,874.50 for medical expenses and $7,905.47 for damage to Plaintiff's vehicles. (Id. at 4-5.) Dr. Roberts explicitly noted that she did not estimate lost wages as she understood Plaintiff had not made such a claim. (Id. at 5.)

Dr. Albrecht, for Plaintiff, reported that $860,198 represented the total economic impact of the injury. (Docket Entry 25-9 at 3.) In that regard, Dr. Albrecht identified $764,414 as lost wages and $95,784 for the diminished value of household activities. (Id.) Dr. Albrecht expressly excluded "any historical medical expenses" incurred by Plaintiff and made no finding regarding property damage. (Id.)

### iii. The Orthopaedic Surgeons

On behalf of Defendant, Dr. Paul opined as to Plaintiff's physical injuries. (Docket Entry 25-5.) After reviewing Plaintiff's medical history, Dr. Paul concluded that he could not assign permanent impairment ratings without more information. (Id. at 5.) Dr. Sloand, for Plaintiff, could not issue a final assessment without additional information, but did estimate a minimum impairment rating of 25% to the right upper extremity. (Docket Entry 25-10 at 3.) Dr. Sloand also noted that Plaintiff's injuries included "some element of psychological overlay," (id.), and referred to Dr. Weisler's diagnosis (id. at 2).

iv.  Analysis

The expert reports of Ms. Vargas, Dr. Albrecht, and Dr. Sloand do not qualify as rebuttal.  In so concluding, the Court finds the case of <u>Calvert v. Ellis</u>, No. 2:13-cv-00464-APG-NJK, 2014 WL 3897949 (D. Nev. Aug. 8, 2014) (unpublished), illuminating. <u>Calvert</u> arose out of a motor vehicle accident, with the parties litigating the issue of damages.  <u>Id.</u> at *1, *4.  During the course of discovery and after the plaintiff submitted her expert reports, the defendants submitted rebuttal experts, including an economist meant to address the reasonableness of the plaintiff's medical expenses.  <u>Id.</u> at *1, *2.  The plaintiff moved to strike the report as an untimely affirmative report.  <u>Id.</u> at *1.  The district court noted that the defendants' expert did not address any of the opinions issued by the plaintiff's experts.  <u>Id.</u> at *3.  The district court found that the economist's expert report did not qualify as a rebuttal report.  <u>Id.</u> at *4.  In so finding, the district court reasoned that, "[a]lthough [the economist] and [the] [p]laintiff's experts' reports address the same general subject matter of the case, [the economist's] report does not directly address the findings, <i>i.e.</i>, 'the same subject matter,' of [the] [p]laintiff's experts' reports."  <u>Id.</u> (internal citation omitted).

Similar to <u>Calvert</u>, here, Plaintiff's experts' reports do not address any of Defendant's experts' reports; Plaintiff's experts' reports do not rebut, contradict, or respond to the specific

opinions or conclusions of Defendant's experts' reports. (See Docket Entries 25-8, 25-9, 25-10.) Rather, each of Plaintiff's experts' reports offers its own theories without limitation to "attacking the theories offered by [Defendant's] experts," International Bus. Machs. Corp., 1995 WL 115421 at *3.

Moreover, Plaintiff's experts' reports each discuss an aspect related to Plaintiff's damages - Ms. Vargas regarding Plaintiff's future work potential, Dr. Albrecht regarding Plaintiff's economic injuries, and Dr. Sloand regarding Plaintiff's physical injuries from the incident. However, Plaintiff bears the burden of proving his damages, see Hale v. Fawcett, 202 S.E.2d 923, 925 (Va. 1974) ("To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted."),[4] and "[t]he plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief," Braun v. Lorillard, Inc., 84 F.3d 230, 237 (7th Cir. 1996). In other words, Plaintiff attempts to "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in

---

[4] The underlying actions on which Plaintiff relies for his claims occurred in Virginia (see Docket Entry 19), so it appears Virginia law would govern, Smith v. Cessna Aircraft Co., Inc., 571 F. Supp. 433, 435 (M.D.N.C. 1983) ("[T]he North Carolina choice of law rule is to apply the *lex loci delicti* to all substantive questions.").

chief." <u>Noffsinger v. Valspar Corp.</u>, No. 09 C 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) (unpublished).

For these reasons, the Court finds that the expert reports of Ms. Vargas, Dr. Albrecht, and Dr. Sloand do not qualify as rebuttal.

### b.  Dr. Weisler

Dr. Weisler's expert report does not qualify as rebuttal.  As an initial matter, Dr. Weisler's expert report focuses on Plaintiff's mental health issues (Docket Entry 25-7) - a topic on which Defendant did not submit an expert report.  In his expert report, Dr. Weisler determined that "[Plaintiff] unequivocally coded positive for a Current Major Depressive Episode/Disorder, Chronic Post Traumatic Stress Disorder (PTSD), and Panic Disorder during [Dr. Weisler's] MINI diagnostic interview for the current time and since [Plaintiff's] being attacked and injured." (<u>Id.</u> at 2 (emphasis removed).)  That determination led Dr. Weisler to conclude: "[Plaintiff's] qualify of life and functioning are currently severely impacted by his Chronic Posttraumatic Stress Disorder and Major Depressive Disorder as well as to a lesser degree by Panic Disorder. . . . I do not feel he is capable of working in a public setting at this time." (<u>Id.</u> at 8 (emphasis removed).)

Plaintiff provides two reasons why Dr. Weisler's report qualifies as rebuttal.  First, Plaintiff observes that Dr. Weisler

provides contradictory opinions to Defendant's experts, such as Dr. Weisler's opinion that Plaintiff could not work compared to Ms. Sawyer-Little's opinion that he conceivably could.  (Docket Entry 27 at 7.)  Second, Plaintiff (significantly shifting stances), claims that his mental health issues constitute previously unavailable evidence.  (Id. at 8.)

As to Plaintiff's first point, as stated in Calvert, an expert report must directly address an opposing expert's findings or opinions to qualify as rebuttal.  See Calvert, 2014 WL 3897949 at *4.  Here, Dr. Weisler's expert report does not directly contradict or respond to the findings or opinions of Defendant's experts' reports.  (See Docket Entry 25-7.)  Although Dr. Weisler's expert report takes different general positions than Defendant's experts' reports, that does not suffice to qualify as rebuttal.  Calvert, 2014 WL 3897949 at *4.

Plaintiff's second point, that Dr. Weisler's expert report addresses previously unavailable evidence, also fails.  Plaintiff argues that, because "Plaintiff's underlying psychiatric issues were undiagnosed and there was nothing in [] Plaintiff's medical records to indicate that such issues existed" (Docket Entry 27 at 8) and because "Defendant's own medical expert, Dr. [] Paul, [] first raise[d] the medical issue that Plaintiff is possibly suffering from a major mental illness" (id. at 10), Dr. Weisler's expert report qualifies as rebuttal.

As to Plaintiff's contention that nothing existed in the
medical record to warn him of his mental health issues, his medical
record belies this point.  Plaintiff himself admits that, in July
of 2011, a doctor recommended that Plaintiff undergo a
psychological consultation.  (Docket Entry 27 at 2 (citing Docket
Entry 27-2 at 4).)  Further, Plaintiff states that, in August of
2012, a physician's assistant diagnosed Plaintiff with an
unspecified anxiety disorder (id. at 3 (citing Docket Entry 27-3 at
3)), and, later that month, a doctor changed the diagnosis to
Generalized Anxiety Disorder (id. (citing Docket Entry 27-3 at 3)).
Moreover, Defendant, in its reply, further points out that the
doctor prescribed Plaintiff Paxil and Buspar (Docket Entry 28 at 2
(citing Docket Entry 27-3 at 1-2)) - drugs used to treatment an
array of mental disorders (see Docket Entries 28-1, 28-2),[5] and
that Plaintiff's medical records include references to reports of
crying spells and anhedonia[6] (Docket Entry 28 at 2 (citing Docket
Entry 27-3 at 2)).

Moreover, Plaintiff's father and daughter described prior
behavior that confirm the obviousness of the potential need for a
psychiatric evaluation.  (See Docket Entry 25-7 at 3 ("[Plaintiff's

---

[5] The Court may take judicial notice of these facts pursuant
to Federal Rule of Evidence 201.  See Wible v. Aetna Life Ins.
Co., 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005).

[6] "Total loss of feeling of pleasure in acts that normally
give pleasure." Doland's Illustrated Medical Dictionary, Anhedonia
91 (32d ed. 2012).

daughter] also discussed how the attack had significantly impacted [Plaintiff's] ability to be involved, relate, and function anywhere near as well as he had prior to being attacked and shot."); id. at 5 ("Both his father and daughter agree that [Plaintiff] began avoiding most things including friends and activities since the shooting. They describe him as being more withdrawn."); id. (relating statement of Plaintiff's daughter that: "'Loud noises scare and startle [Plaintiff] at night especially and he looks frightened. [Plaintiff] stopped going places and doing things and he stays on guard when he leaves the house. He has recurrent dreams of being shot, but keeps it to himself.'").)[7] Thus, a discussion with either Plaintiff's father or daughter would have revealed the existence of possible mental health issues. Therefore, although the extent and specific nature of Plaintiff's psychiatric symptoms may have remained unclear at the time of Plaintiff's expert report deadline, the Court cannot conclude that this matter concerned "evidence unavailable through no fault of [] [P]laintiff," Allen, 737 F.2d at 1305.

Nor does the Court credit Plaintiff's contention that Dr. Weisler responds to Dr. Paul's offhand remark regarding posttraumatic stress disorder. Dr. Paul's report states: "It is further true that the amnesia for events regarding worker's

---

[7] Although these statements did not exist prior to Dr. Weisler's interview, the behaviors they describe did pre-date his involvement in the case.

compensation injuries in [Plaintiff's] deposition seem [sic] to be at odds with his clear memory of the incidents of the night of the shooting and seem to be somewhat inconsistent thereof.  Perhaps a mental health professional would be able to ferret out this amnesia with posttraumatic stress as a cause of disorder or not."  (Docket Entry 25-5 at 4-5.)  Only the first foregoing sentence constitutes a fact.  See Webster's II, Fact 460 (1984) ("1. Something put forth as objectively real.  2. Something objectively verified.").  Dr. Paul's second sentence does not assert a fact, but instead raises a possibility, i.e., whether posttraumatic stress could have caused Plaintiff's behavior at the deposition.  Further, Dr. Weisler's expert report far exceeds the scope of Dr. Paul's remarks, in that, Dr. Weisler's opinions go beyond whether posttraumatic stress caused Plaintiff's behavior at the deposition.  Simply put, Dr. Weisler's expert report does not qualify as rebuttal.

## 2.  Sanctions

Having found Plaintiff's experts' reports as untimely affirmative expert reports, the Court must now determine whether good cause exists under Federal Rule of Civil Procedure 16(b)(4) to allow late disclosure and (if not) what sanction, if any, to impose under Federal Rule of Civil Procedure 16(f).  See generally Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306 (M.D.N.C. 2002).

### a. Good Cause

Plaintiff has not shown good cause for his failure to timely disclose his expert reports. In this regard, Plaintiff insists that he neither knew nor had reason to know of a mental health issue prior to the deadline for initial expert reports, and thus he had no reason to seek a psychiatric evaluation. (Docket Entry 27 at 9-11.) In Section 1.b, the Court has already rejected this argument. Moreover, Plaintiff makes no effort to justify the late disclosures of Ms. Vargas, Dr. Albrecht, or Dr. Sloand. (Id.) Therefore, good cause does not permit Plaintiff's late disclosure of his experts' reports.

### b. Relevant Factors

The Court next must determine what, if any, sanction to impose. In making that assessment, the Court may consider: (1) the party's explanation for the failure to obey the order, (2) the importance of the expert opinion, (3) the prejudice to the opposing party, (4) the availability of lesser sanctions, (5) the interest in expeditious resolution of the litigation, (6) the Court's need to manage its docket, and (7) the public policy favoring disposition of cases on the merits. Walter Kidde Portable Equip. v. Universal Sec. Instruments, Inc., No. 1:03CV537, 2005 WL 6043267, at *2 (M.D.N.C. July 7, 2005) (unpublished); see also Akeva, 212 F.R.D. at 311.

## i. Explanation for Non-compliance

Plaintiff fails to provide a sufficient explanation for violating the scheduling order. He offers two justifications. (Docket Entry 27 at 12-13.) First, Plaintiff argues that, "to the extent that the Court finds that Plaintiff's expert opinions go beyond Defendant's 'extremely modest' expert opinions[,] [Plaintiff] believed that [he] needed to designate experts with sufficiently concrete opinions as to satisfy Federal Rules of Evidence 702, 703, and/or 705." (Docket Entry 27 at 12 (internal citation omitted).) Plaintiff does not elaborate on this point. (See id.) Of course an expert witness must satisfy the prerequisites of Rules 702, 703, and 705, see Puglisi v. Town of Hempstead Sanitary Dist. No. 2, No. 11-CV-0445(PKC), 2013 WL 4046263, at *3 n.3 (E.D.N.Y. Aug. 8, 2013) (unpublished) ("Federal Rules of Evidence 702, 703, and 705 collectively set forth the method by which, and on what topics, a witness designated as an expert may render opinion testimony."), but Plaintiff provides no explanation as to why he could not have designated appropriate expert witnesses without violating the scheduling order (Docket Entry 27 at 12). This explanation thus provides no justification for violating the scheduling order.

Second, Plaintiff argues that he did not know of his mental health issues and thus he did not initially designate any experts. (Docket Entry 27 at 12-13.) As detailed in Section 1.b, the Court

16

rejects this argument. In addition, although Plaintiff relies on his mental health diagnosis as the impetus for including these expert reports, the expert reports also include analysis of Plaintiff's physical health and limitations (see Docket Entry 25-8 (opining on Plaintiff's vocational options regarding both his physical and mental health); Docket Entry 25-10 (opining on the physical injuries Plaintiff suffered from the shooting)) - which Plaintiff knew of prior to Dr. Weisler's diagnosis.

Similarly, Dr. Albrecht opines on Plaintiff's economic damages, including lost wages, as a result of his injury. (Docket Entry 25-9.) However, these damages did not suddenly come to light because of Dr. Weisler's diagnosis (given that Ms. Vargas found Plaintiff vocationally disabled because of the injuries to his dominant arm (Docket Entry 25-8 at 8)), rather, Plaintiff could have calculated his economic damages prior to Dr. Weisler's diagnosis. In sum, the Court deems Plaintiff's explanation for his violation of the scheduling order to weigh heavily against him in the sanctions calculations.

### ii. Importance of Expert Opinion/Preference for Merits Resolution

Without Dr. Weisler's report, Plaintiff likely cannot establish that his mental health issues resulted from the incident. See Russell v. Mounsey, No. 3:97-CV-0008 RP, 1998 WL 456434, at *1 (N.D. Ind. Apr. 24, 1998) (unpublished) (allowing the plaintiff to testify regarding his symptoms but not their particular cause).

17

However, Plaintiff can testify to his physical injuries. <u>See</u> <u>Batiste v. City of Beaumont</u>, 426 F. Supp. 2d 395, 403 (E.D. Tex. 2006) ("[A] lay person is competent to testify concerning physical injuries and conditions that are susceptible to observation by an ordinary person."). Plaintiff also has expressed an intent to "rely on treating physicians and other evidence to prove that Plaintiff has suffered a permanent partial disability to his arm and the resulting value." (Docket Entry 27 at 13.) Under these circumstances, although exclusion of Plaintiff's experts' reports undoubtedly will impact his case, it does not appear that such exclusion would defeat Plaintiff's claims as a matter of law. <u>See</u> <u>Indura S.A. v. Engineered Controls Int'l Inc.</u>, No. 1:10CV457, 2011 WL 3862083, at *11 (M.D.N.C. Sept. 1, 2011) (unpublished) (deeming this factor to weigh against exclusion of reports where such action likely would foreclose merits-based determination of claims).

Accordingly, these factors do not favor Plaintiff's position opposing exclusion.

### iii. Prejudice to Opposing Party

Allowing Plaintiff's experts' reports would prejudice Defendant. Defendant contends that, if the Court allowed Plaintiff to submit his experts' reports that Defendant would need to retain an expert in psychiatry, obtain new reports from its previously designated experts, depose Plaintiff's experts, and likely depose Plaintiff again. (Docket Entry 25 at 11.) To the extent Defendant

18

would have incurred some obligation (other than the cost of re-doing reports) if Plaintiff had made a timely disclosure, <u>see</u> <u>Indura</u>, 2011 WL 3862083 at *12 n.12, Defendant would now have to act in a shortened time-frame. Significantly, Plaintiff attempts to introduce four experts, which would create a significant amount of work for Defendant in the months before trial.

In addition, Plaintiff has conceded that Dr. Weisler's report creates a "fundamental shift in Plaintiff's theory of economic loss" (Docket Entry 27 at 13), and this fundamental shift would also prejudice Defendant. From the beginning of this case, Plaintiff has focused the damages aspect of this case on his physical injuries. (<u>See</u> Docket Entry 28-4 at 2 (Plaintiff's SF-95 form filed with the Coast Guard which notes the injuries to his right hand and arm).) Plaintiff now attempts to shift the focus to his mental health, and thereby extends his claims beyond "garden-variety pain and suffering" (Docket Entry 27 at 13). Such actions would force Defendant to rethink its approach to the damages portion of this case, and may moot some of its previous work. Thus, the Court finds that Plaintiff's violation of the scheduling order has prejudiced Defendant, a circumstance that supports exclusion of the untimely reports.

<u>iv.  Availability of Lesser Sanctions</u>

Lesser sanctions would not suffice to effectively mitigate the prejudice sustained by Defendant.  Plaintiff proposes three lesser sanctions for violating the scheduling order: (1) allow Defendant to supplement its reports; (2) allow Defendant to re-depose Plaintiff; and/or (3) order Plaintiff to undergo an examination pursuant to Federal Rule of Civil Procedure 35.  (<u>Id.</u> at 17.) Regarding Plaintiff's first suggestion, allowing Defendant's experts to supplement their reports would address at least some of the case-related prejudice (if such supplementation could occur in a timely fashion), but leaves questions about associated increased costs (including as associated with potentially-compressed time schedules).[8]

Plaintiff's other two options provide even less promise of relieving prejudice to Defendant.  At the outset of its brief, Defendant noted Plaintiff's behavior at his deposition where, many times, he provided non-responsive answers to Defendant's questions. (Docket Entry 25 at 3.)  Given this behavior and Plaintiff's apparent inability to recall events, an additional deposition likely would not benefit Defendant.  A Rule 35 examination seemingly would encounter similar road-blocks.

_____

[8] The Parties appear to agree that the Court cannot award attorney's fees to the United States.  (<u>See</u> Docket Entry 25 at 13; Docket Entry 27 at 17.)  However, they have not addressed whether the Court could award Defendant's other reasonable expenses or the extent to which that option would suffice.  (<u>See</u> <u>id.</u>)

Overall, available lesser sanctions do not appear to weigh against exclusion in any significant fashion.

### v.   Interest in Expeditious Resolution/Need for Docket Management

The Court has an interest in expeditiously resolving this litigation and managing its docket.  With a bench trial set for the October 2015 term (Docket Entry 23) and discovery set to end on April 15, 2015 (Text Order dated Feb. 23, 2015), permitting Plaintiff to submit his four untimely experts would undoubtedly require an extension of the scheduling order, and possibly would imperil the trial date.  Allowing supplemental/additional experts and further discovery would undoubtedly require a modification of the scheduling order.  "The Court [however] has a strong tradition of enforcing scheduling order deadlines to ensure that trials take place as planned."  Indura, 2011 WL 3862083 at *13.

Moreover, Plaintiff's experts primarily put forth opinions on topics completely unforeseen by Defendant (Plaintiff's lost wages and mental health), unlike the case cited by Plaintiff (see Docket Entry 27 at 18-19 (citing Indura 2011 WL 3862083)), where the expert reports addressed matters already at the center of the litigation, see Indura, 2011 WL 3862083 at *11.  Significantly, here Plaintiff's experts' reports raised two new theories of damages in the form of lost wages (Docket Entry 25-9) - a claim which Plaintiff had previously denied making (Docket Entry 28-6 at

3) - and psychological harm (Docket Entry 25-7).  These factors thus counsel in favor of Defendant's request for exclusion.

### vi.  Synthesis of Factors

Taking all the foregoing factors into account, striking Plaintiff's experts' reports constitutes a "just order[]," Fed. R. Civ. P. 16(f)(1), to account for Plaintiff's failure to comply with the scheduling order.  Given the absence of any colorable excuse for Plaintiff's non-compliance, the absence of any clear, case dispositive impact attributable to exclusion, the prejudice to Defendant, the apparent insufficiency of alternative sanctions, and the threat to orderly litigation posed by Plaintiff's actions, striking his experts' reports represents the proper course.

### CONCLUSION

Plaintiff untimely submitted four affirmative expert reports, and the relevant circumstances warrant striking them.[9]

**IT IS THEREFORE ORDERED** that Defendant's Motion to Strike Expert Reports and Exclude Testimony (Docket Entry 24) is **GRANTED.**

                              /s/ L. Patrick Auld
                            **L. Patrick Auld**
                    **United States Magistrate Judge**
April 1, 2015

_____

[9] Because (as discussed in Footnote 8 above) the United States has agreed that it cannot recoup attorneys' fees and has not otherwise requested expense-shifting, the Court deems the circumstances of this case to fall within the exception to mandatory expense-shifting associated with the litigation of the instant Motion, see Fed. R. Civ. P. 16(f)(2).